# 1847.

---

### COMMITTEE ON ELECTIONS.

Messrs. *Thomas Tolman*, of Boston, *John S. Ladd*, of Cambridge, *Warren Lovering*, of Medway, *George S. Boutwell*, of Groton, *Otis P. Lord*, of Salem, *Hardin Hemenway*, of Shutesbury, *Hiram A. Beebe*, of Westfield.

---

### DANA.

Under Stat. 1844, c. 78, the poll is to be considered as opened, when the ballot-box is presented to the voters, and they are called on to prepare their votes for a balloting.

It is improper to allow any one to vote after the ballot-box has been turned.

It is clearly contrary to the express provisions of law, to delay the public declaration of the result of a balloting, after the votes have been counted, and the result ascertained.

It seems, that a ballot deposited after the result of a balloting has been ascertained, though not declared by the presiding selectman, is not to be counted.

THE election of Benjamin Richardson, the member returned from the town of Dana, was controverted by James S. Brown and fifty-five other voters of that town,[1] upon grounds stated in the following report[2] of the committee on elections, namely:—

"At the meeting in the town of Dana, on the ninth of November last, there were four ballotings for a representative. The first three were declared to have resulted in no choice. On the fourth, the selectmen declared the sitting member to be elected, and gave him a certificate of his election in the usual form. The certificate is signed by the three selectmen of the town, comprising the whole number, and contains a constable's return, that the person elected was duly notified.

The petitioners allege, that the proceedings on the fourth ballot were irregular and illegal, and that the supposed elec-

[1] 69 J. H. 34.                    [2] Same, 300.

tion of said Benjamin Richardson ought to be set aside and his seat vacated.

The sitting member avers, that he was, in fact, elected on the third ballot, notwithstanding the selectmen announced that there was no choice. But, if it should appear that he was not chosen on the third ballot, he contends that he was legally elected on the fourth.

A large number of witnesses have testified to facts relating to this election, but the committee have not considered it necessary to report the evidence in full. Such portions of it only will be presented, as justice to the parties, and a correct understanding of the case, seem to require.

If the sitting member, as he alleges, was lawfully chosen on the third trial, it is of little consequence, so far as he is concerned, whether any, and, if any, what irregularities might have taken place on the fourth. He acquired rights which it was not in the power of the selectmen, or the town itself, to take away from him. If another person had been declared to be elected on the fourth trial, had received the usual credentials, and had taken his seat in the house, that seat would be vacated on making the requisite proof of a prior and paramount right.

The committee will first consider the question, whether the sitting member was chosen on the third trial, and invite attention to the following evidence :—

Isaac Doane : 'I am one of the selectmen of Dana, and was present at the meeting on the 9th of November last. After voting on the third ballot for representative, the chairman said, that if there was no objection, he would turn the box. No objection was made, and he turned it. The votes were counted, and the result was that Benjamin Richardson had 70 votes, Mr. Stone 60, and there were 9 scattering. The town-clerk set them down and added them up. I asked the clerk why the chairman did not declare that Mr. Richardson was elected, but heard no reply. After the adding up, I stood a few minutes, and asked him again, I think, why the vote was not declared. I think it was fifteen minutes after the clerk had footed up before the vote was declared. We all saw what the result was. We all assisted in counting. Elias Woodward passed by, and, I suppose, put in a vote, and the declaration was then immediately made that there was no choice. To the best of my judgment the delay, between the time that the count was completed on the third ballot, and the declaration of the vote, was from ten to twenty minutes. It could not have been more than a minute, after Mr. Woodward passed, before the vote was declared. From fifteen to twenty minutes were occupied in counting before footing up. The town clerk counted

my pile of votes after me, and I counted his. It has been our custom to receive votes after the box was turned, and before the counting was completed and the declaration made.'

George G. Braham deposed, that 'near the close of the third balloting he took a seat near the selectmen. The box was turned soon after and the selectmen proceeded to sort and count the votes. One of the selectmen, Mr. Isaac Doane, sat down by me, and said Mr. Benjamin Richardson was chosen by a majority of one. There was some space of time, after counting the votes, when the selectmen appeared to be doing nothing. After a while, Elias Woodward came up with a vote and laid it on the desk, and immediately, perhaps one minute after, the chairman declared there was a tie and no choice. I recollect no person voting after the box was turned, but Woodward.'

Nathaniel L. Johnson deposed: 'I voted on the third ballot; went out of the hall, and returned. I had understood there was a choice in the election of Mr. Richardson. When I returned, I saw the selectmen in their places, apparently doing nothing. After waiting a few minutes, Elias Woodward came up and offered his vote, which was objected to by Jonathan E. Stone, one of the selectmen, for the reason that it was too late; but the vote was received, and almost immediately it was declared by the chairman that there was a tie and no choice.'

Albert Bosworth deposed: 'After the votes were given in, (on the third trial,) the chairman said, if there is no objection, I shall turn the box. The box was turned, and the votes counted. I stood near by, and heard it said, by the chairman, that Mr. Richardson was chosen by a majority of one. The votes were counted twice at least. Soon after, a Mr. Woodward came up with his vote and some one objected; but the vote was received, and then the selectmen declared that there was a tie, and no choice. The chairman said to the town clerk, that Mr. Richardson was chosen, not openly. It was not said in a whisper, but it was said so that I heard it distinctly. It was not said in a loud tone. I was about as near to him as the town clerk was. I stood by and counted the votes at the same time the selectmen did, and I know there was no counting of the votes after Woodward gave in his.'

There is more evidence of a similar purport. The law relating to this subject is contained in the fifth chapter of the Revised Statutes, section sixth: 'They (the selectmen) shall openly receive, sort, and count the votes (for representative) there given by the qualified voters present, and shall forthwith publicly declare who are the persons elected.'

A majority of the committee are of opinion, that the sitting member was fairly chosen on the third ballot. The votes had been counted, and it was known to the selectmen, town clerk, and to some other citizens of the town, that Mr. Richardson was elected by a majority of one vote. Ten minutes elapsed, if not more, after the result of the balloting was ascertained, before Mr. Woodward made his appearance and claimed his

70

right to vote. The majority of the committee believe, that the practice which prevails, in some towns, of allowing persons to vote after the box is turned, ought to be discontinued. But whatever may be the custom, as to receiving votes while the town officers are engaged in counting, it is clearly contrary to the express provisions of law to delay making a public declaration, after the counting is finished and the result ascertained. The statute requires that the declaration shall be made forthwith. The majority of the committee do not intend, in the present case, to impute any improper motives to the selectmen. They probably intended to discharge their duty faithfully, but acted, as we think, under misapprehension or mistake.

It is easy to see, that if the result of a balloting is not declared 'forthwith,' or immediately after all the votes are counted, an opportunity is given to the presiding officers, should they be so disposed, to exercise an influence inconsistent with the purity of elections. Suppose, for instance, that the candidate should be the political or personal friend of the selectmen, and it is ascertained, from counting, that only one or two votes are wanted to secure his election, it might sometimes be in their power, (as they know from the check list who have not voted, as well as those who have,) by sending messengers after absentees and postponing a declaration, to secure their object. Or, if a political opponent was found to be chosen by a very small majority, they might, by the same unfair management, defeat his election.

The committee have already stated, that the petitioners contest the right of the sitting member to his seat, in consequence of irregular proceedings, which, they allege, took place on the fourth trial. The first and principal objection is, 'that the poll was not opened before five o'clock in the afternoon.' The 78th chapter of the acts of the year 1844 is in these words :—'In all elections for representatives to the general court, when a choice is not made on the first ballot, other ballotings may be had on the same day : *provided*, that in no case shall the poll at such elections be opened after five o'clock in the afternoon, on said day.'

Those who are familiar with the history of our legislation for a few years past, know that this act was intended as a substitute for the celebrated sunset law of 1839.   So much of the second section of that law, as relates to closing the poll before sunset, was expressly repealed March 24th, 1843, and the third section was rendered inoperative by the act of 1844.  Some have argued, that the sunset law was unconstitutional, others, that it was merely directory to the selectmen.   It has been said, that, as the constitution allows the whole day for the choice of a representative, it includes, of course, the time between sunset and twelve o'clock at night, and that the legislature does not possess the power to alter it.   Those who considered that law as mandatory merely to the selectmen, admitted that it was a good regulation for the accommodation of aged and infirm voters, and for preventing riots and disturbances, in the night time ; but contended, that where an election was effected after sunset without any fraud or unfairness, the seat of the person chosen ought not to be vacated, though the selectmen might be punished for its violation.   The same objections that were made to the old law, requiring the poll to be closed by sunset, may be urged against the one now under consideration, which directs that the poll shall not be opened after five o'clock in the afternoon.   The same constitutional principle is involved in both, and hence the decisions of the house, in cases which occurred under the old law, are applicable to this.   It will be seen, that the house took a different view of the subject, insisting on a strict compliance with the law, notwithstanding all the objections urged against it.   It was decided to be constitutional, and something more than directory to selectmen.   In the year 1843, the seat of Abner Shedd, member from Burlington, (*ante*, 460,) was vacated for no other cause than that the poll was kept open after sunset.   It was said by the committee, in that case, 'that the act of the town, in commencing a ballot after sunset, was a direct violation by the town of a law of the land; that, although a right to be represented is a high municipal privilege, and not to be taken away upon slight ground, still, a town violating the law has less claim to con-

sideration.' In the year 1844 the seats of the four members from Charlestown (*ante*, 518,) were vacated for the same reason, under the third section of the act, not repealed in 1843.

The facts in relation to the fourth ballot in the town of Dana, as proved by witnesses on both sides, are briefly these :—Immediately after the chairman had declared that there was a tie and no choice on the third ballot, he 'presented his box,' (in the language of a witness for the petitioners,) and said, 'prepare yourselves for another balloting.' James S. Brown, one of the petitioners, testified, that 'the chairman called on the voters to prepare their votes for a fourth ballot.' This was between four and five o'clock in the afternoon. The balloting, however, did not commence immediately after this call from the chairman. The selectmen spent some time in sealing up the returns for state officers. There was some excitement in the meeting, caused by the near approach of five o'clock. Considerable discussion took place about the legality of proceeding to another choice. The election law was read. A motion was made to dissolve the meeting, which was considered to be out of order, as the returns were not sealed up, which the law requires to be done in open town-meeting. Another motion was made to adjourn to the next day, which the chairman at first declared to be a vote, but, the vote being doubted, it was finally determined not to be a vote to adjourn. These proceedings occupied so much time, that it was clearly past five o'clock before the first vote, on the fourth balloting, was deposited in the box. The voting then proceeded, and Benjamin Richardson, the sitting member, received nearly all the votes given in, his opponents having either left the meeting, or declined voting, on the ground, that the doings were illegal.

If the poll cannot be considered as open until the selectmen begin to receive votes and check the list, and former precedents of decisions, under the law of 1839, which have been cited, are to govern, then the sitting member was not legally chosen on the fourth ballot. The committee, however, are inclined to give the statute a more liberal construction. They are of

opinion that the poll was opened, at the time when the chairman presented the box and called on the voters to prepare themselves with votes for another ballot. Every body was notified that another balloting was to be had. The depositing of the votes and checking the list were merely deferred for a short time, to accommodate the selectmen in sealing up the votes for state officers, and, while thus engaged, a discussion arose, which occasioned a delay until after five o'clock.

Another objection to the legality of the election, on the fourth ballot, alleged by the petitioners, is, that the meeting was fairly adjourned to the next day. On this point, much testimony was introduced by both parties. The committee, however, are satisfied, that although the chairman at first declared the meeting to be adjourned, and thereupon several voters left their places and proceeded towards the door, intending to leave the hall, and some near the door might have left it entirely, yet that the vote was seasonably doubted and the question put again, when the chairman declared that it was not a vote to adjourn. Several witnesses testified that the vote was immediately doubted; that the selectmen had not left their seats; that the house was divided and counted; and that the meeting refused to adjourn.

The minority of the committee are of opinion, that the sitting member was not chosen on the third ballot, but think that he was constitutionally elected on the fourth.

The committee, therefore, are unanimously of opinion that the sitting member was duly elected on the ninth of November last, and that he is entitled to a seat in this house; and they recommend that the petitioners have leave to withdraw their petition."

This report was submitted to the house on the 20th of February,[1] and ordered to be printed; and on the 27th of February it was agreed to.[2]

[1] 69 J. H. 300.      [2] Same, 356.